NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-976

FEVERLY ALEXANDER

VERSUS

FRANK'S FIVE STAR MARKETING, INC.
D/B/A REES STREET MARKET, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 76,954
HONORABLE JAMES R. MCCLELLAND, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, Jimmie C. Peters, Marc T. Amy, and James T. Genovese, Judges.

Amy, J., dissents and assigns reasons.

REVERSED AND REMANDED.

**John E. McElligott, Jr.**
**Jacob H. Hargett**
**Davidson, Meaux, Sonnier, McElligott, Fontenot, Gideon & Edwards**
**P. O. Box 2908**
**Lafayette, LA 70502-2908**
**(337) 237-1660**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Feverly Alexander**

**Joseph T. Puhekker**
**John E. Ortego & Associates**
**4023 Ambassador Caffery Pkwy**
**Lafayette, LA 70503**
**(337) 988-7240**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
**State Farm Insurance Company**
**Frank's Five Star Marketing, Inc. d/b/a Rees Street Market**

PETERS, J.

The plaintiff, Feverly Alexander, instituted this suit to recover damages she sustained when she slipped and fell in the Rees Street Market in Breaux Bridge, Louisiana. Named as defendants in the suit are Frank's Five Star Market, Inc., d/b/a Rees Street Market (Rees Street Market), and the corporation's liability insurer, State Farm Insurance Company (State Farm). Ms. Alexander appeals the trial court's grant of a summary judgment in favor of the defendants dismissing her claims against them. For the following reasons, we reverse the trial court judgment and remand the matter to the trial court for further proceedings consistent with this opinion.

## DISCUSSION OF THE RECORD

It is undisputed that a significant rain event occurred in Breaux Bridge on September 22, 2009, and particularly into the afternoon of that day. In her September 21, 2010 petition for damages, Ms. Alexander asserted that at approximately 3:30 p.m., on September 22, 2009, she walked into the Rees Street Market and "slipped and fell on a slippery substance which was left on the floor." The petition also asserts that no signs of any nature existed to warn her of the hazardous and dangerous condition created by the slippery substance. The defendants followed up their November 17, 2010 answer with a November 14, 2010 motion for summary judgment, which is the subject of this appeal. Attached to the defendants' brief in support of their motion was an affidavit of Dustin Angelle, the manager of Rees Street Market on the day of the accident; and Ms. Alexander's July 29, 2011 discovery deposition.

Mr. Angelle asserted the following in his affidavit:

1. On September 22, 2009, I was employed by Rees Street Market as a cashier[.]

2. In my capacity as an employee of Rees Street Market, I am personally familiar with the store's procedures for handling rainy weather outside the store.

3. The procedure requires that when it is raining outside employees place mats near the store's entrance and place warning signs on the floor to advise customers of the potential for slippery conditions.

4. I was present and working at the Rees Street Market on September 22, 2009, the day on which Plaintiff, Feverly Alexander fell.

5. On this date, the store procedures for raining days were followed and mats were placed at the store's entrance and warning signs were placed on the floor.

6. The store was fairly busy on September 22, 2009 and there were a number of customers. No customer ever complained about the presence of puddles of water or any other slippery condition near the store's entrance, and no person besides Ms. Alexander slipped.

7. I personally assisted Ms. Alexander after she fell and observed the condition of the floor. The floor in proximity to where Ms. Alexander fell was dry and there were no puddles on the floor.

Ms. Alexander testified in her discovery deposition that she and her three children (ages sixteen, eleven, and five) drove from their home to the Rees Street Market and arrived sometime shortly after 3:00 p.m. on the afternoon of September 22, 2009. Initially, she and the three children went into the store through an "ugly" rain, and did so without incident. She recalled that there were mats[1] on the floor at the entrance, although she could not remember how many. She attempted to wipe the flip flops she was wearing on the mats, but the mats were "soaking wet." Additionally, she did not recall seeing any warning signs at the entrance, although she could not affirmatively state that none were present.

According to Ms. Alexander, when she attempted to check out after completing her shopping, her debit card was rejected at the cash register, and

---

[1] The mats were described by some witnesses as "rugs."

because it was rejected, the cashier would not take a check on her account. She then telephoned the children's father to bring her some cash. Also, the children had already taken the groceries to their vehicle, so she had to go back into what had become a drizzling rain and retrieve them until they could be paid for. In leaving and reentering the store, she again traversed the mats at the entrance without incident.

When the children's father arrived, Ms. Alexander again traversed the mats and met him outside in the drizzling rain. Ms. Alexander admitted that during all of these trips across the mats, she had no problems with slipping. However, as she reentered the store after obtaining the money to pay for the groceries, she slipped and fell. Ms. Alexander testified that the accident occurred while her feet were located on the mats, and not as she was stepping off of the mats. However, after the fall, her left foot was still on the mat and her right foot was on the floor. Additionally, her clothes were wet from coming in contact with the mat when she fell. In explaining the mechanism of the fall itself, Ms. Alexander testified that her legs went in different directions and she fell backward. The end result was that Ms. Alexander fractured her left ankle.

When questioned concerning her observations of puddles or accumulation of water on the floor during any of her trips in and out of the store, Ms. Alexander candidly acknowledged that she had observed none. In fact, she did not see any accumulations after her fall. Furthermore, she could not say that after the accident she observed no warning signs in the area. Instead, she could only say that she did not recall seeing any.

In opposition to the motion to summary judgment, Ms. Alexander provided the trial court with her March 6, 2012 affidavit; a September 22, 2009 hand-written

statement signed by her and Mr. Angelle; her July 29, 2011 deposition; the February 7, 2012 deposition of Megan Hebert, the current manager of Rees Street Market; the February 7, 2010 deposition of Dustin P. Angelle, the former manager of Rees Street Market; and the February 7, 2012 deposition of Joshua R. Latiolais.

Ms. Alexander's deposition testimony has been summarized above, and with regard to the accident, the September 22, 2009 hand-written statement provides simply that "Walked-in, wiped feet on rug, sign up & slipped." Above the "sign up" comment was the notation "(wet floor)." The March 6, 2012 affidavit contained assertions similar to Ms. Alexander's deposition testimony except that it was more specific on certain events surrounding the accident. In her affidavit, Ms. Alexander asserted that she never saw anyone check the mats during the twenty minutes she waited for the money to be delivered; that during her entire time in the store she never saw any employee check the mats or mop the floor; that the mats were saturated with water; that her reference in the hand-written exhibit to the sign was to the single "wet floor" sign that was present; and that she could not see the "wet floor" sign because it was behind a large display.

Ms. Hebert was a cashier at Rees Street Market on the day of the accident, and had been promoted to manager of the store by the time of her February 7, 2012 deposition. She testified that during her cashier training, she was instructed concerning the store policy on how to handle spills. According to Ms. Hebert, when someone observed a spill, he or she was to notify the personnel in the meat department and they would respond by mopping up the spill. There was no set time for inspection, and the employees were instructed simply to "keep an eye out on the front door" and also respond to customer complaints as they entered the store. They would only walk around for a specific inspection when they "were not

4

too busy." According to Ms. Hebert, all instructions were verbal and there was no written policy.

According to Ms. Hebert, the everyday maintenance policy required that an employee from the meat department mop the entire store every Tuesday. Other than that, the meat department employee would spot mop at closing time each night to remove scuff marks and anything else that needed cleaning, or when called on during the day to mop up spills.

Specifically with regard to rain water problems, Ms. Hebert testified that her training required that the manager place the "Wet Floor" signs out every time it rained because it was expected that water would be tracked into the store. However, she did not recall seeing the signs on the day of the accident and merely assumed, based on her understanding of store policy, that they were present. If any employee were to have observed a large amount of water, this would be reported to the meat department for those employees to address. Concerning the mats, she testified that the store had only two, and that both were always in place regardless of the weather. It was the responsibility of the employees in the meat department to place them out when the store opened in the morning and to put them up at the end of the day.

Mr. Angelle testified that he came on duty at 2:00 p.m. on the day of the accident and, while he could not recall whether it was raining when he began his shift, he did recall that it was raining hard at the time of the accident. When it began raining, he adjusted the "rugs" at the entrance to eliminate exposure to the floor surface as the customers entered, and set the "Wet Floor" warning signs in place. With regard to the number of warning signs he placed, Mr. Angelle could not affirmatively say whether it was one or two signs. Instead, he suggested that "I

would hope two." According to Mr. Angelle, Ms. Alexander almost walked over the warning sign because she took a short cut to the cash register.

Concerning store cleanup policy, Mr. Angelle confirmed that there is no written policy, and there is not even a verbal policy setting a time schedule for inspecting the store. He suggested that if he saw a wet spot, a member of the meat department would be called to clean it up, but if no one was available, he would mop it himself. Additionally, apparently a drainage problem occurred at the front door because of the incline located there. He suggested that "[b]ecause of the way the incline is on the cement, the water would stay there sometimes so we'd have to push it away from the door." While this defect often caused the formation of a puddle in that area on rainy days, he could not say that was the case on the day of the accident.

When Mr. Angelle reached Ms. Alexander, he observed that the floor was not wet where she fell despite the presence of the warning signs to the contrary, but that her clothes were wet. He equated the condition of Ms. Alexander's clothes to be caused by her having entered the store from the rain. However, he acknowledged that he did not recall checking the mats on the day of the accident to see if they were wet.

Mr. Latiolais, who was working as a cashier at Rees Street Market on the day of the accident, further explained the procedure concerning placement of the mats. According to Mr. Latiolais, one of the tasks assigned to the meat department was the placement of the mats on the shopping baskets each evening at closing time so that they could dry out. The next day, the meat department personnel would position one of the dry mats in the front entrance of the store, one in the produce department, and one in the meat department. On rainy days, the mat in the

meat department would be placed in the front of the store at an angle to the other rug.

According to Mr. Latiolais, his training as a cashier did not initially include how to handle spills, and it was only when he transferred to the meat department that he became aware that his new responsibilities included mopping up spills when notified by the personnel in the front of the store that such services were required. Additionally, every day at closing time he was required to dry mop the floor and wet mop the spills. Every other night he would damp mop the entire store. When he mopped during the workday, he placed "Wet Floor" signs at the beginning, middle, and end of the isle where he worked. However, it was not part of his duties as a cashier or employee of the meat department to make a regularly scheduled inspection of the store to check for spills or areas that might create a hazard to the customers.

With regard to rainy days, Mr. Latiolais testified that in addition to having the meat department personnel bring the extra mat to the front of the store, the policy was to place two "Wet Floor" signs near the entrance. One was in front of the ice machine,[2] and the other "when you turned right going by the wine section." He was called from time to time to mop the front entrance, but never saw water accumulating at the door entrance and never had cause to push any water away from the door. With regard to the rainwater cleanup procedure, Mr. Latiolais stated the following:

> They'd go with a dry mop and they'd mop up the water that was up there and put a "Wet Floor" sign in the surrounding areas where it was wet. And normally if it was raining, and the mat wasn't like, really helping, like, where the water was, they'd kind of move the mats to where it was covering where the water was going.

---

[2] Apparently, the ice machine had a propensity to leak as Mr. Latiolais suggested that the sign in front of it was always present regardless of the weather conditions.

Mr. Latiolais could not recall the weather conditions on the day of the accident. However, he did recall that there was a "Wet Floor" sign in front of the ice machine. Although he did not see Ms. Alexander fall, Mr. Latiolais heard her scream when she fell. He identified the point of impact as being just to the left of the second rug.

After a March 14, 2012 hearing on the motion for summary judgment, the trial court issued brief oral reasons for judgment granting the motion. On the same day, the trial court executed a written judgment dismissing Ms. Alexander's claims against the defendants. Ms. Alexander then perfected this appeal, asserting two assignments of error:

1. The trial court erred in concluding that no genuine issues of material fact remained with regard to the liability of Rees Street Market under La.R.S. 9:2800.6 and the applicable Louisiana jurisprudence as applied to the relevant facts in this matter, particularly those relevant facts established in the depositions taken and affidavits prepared in this matter.

2. The trial court erred in granting the defendants' motion for summary judgment considering the plaintiff demonstrated, by a preponderance of the evidence, that the defendants are liable unto her pursuant to Louisiana's applicable law, i.e. La.R.S. 9:2800.6 and the interpretive jurisprudence.

## OPINION

We review grants of summary judgment *de novo* using the same standards that govern the trial court's consideration of whether summary judgment is appropriate; that is, whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. *Ocean Energy, Inc. v. Plaquemines Parish Gov't.*, 04-66 (La. 7/6/04), 880 So.2d 1. As set forth in La.Code Civ.P. art. 966(C)(2),[3] in a motion for summary judgment:

---

[3] Louisiana Code of Civil Procedure Article 966 was amended by 2012 La. Acts No. 257, § 1, and No. 741, § 1. However, for the purposes of this opinion, we are using the pre-amendment version of La.Code Civ.P. art. 966.

The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

The motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B).

In order to prevail in a suit for damages resulting from a fall that occurred on business premises, a plaintiff bears the burden of satisfying the requirements of La.R.S. 9:2800.6:

A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.

B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is

9

insufficient, alone, to prove failure to exercise reasonable care.

C. Definitions:

(1) "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business. For purposes of this Section, a merchant includes an innkeeper with respect to those areas or aspects of the premises which are similar to those of a merchant, including but not limited to shops, restaurants, and lobby areas of or within the hotel, motel, or inn.

D. Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322, or 2695.

In its oral reasons granting the motion for summary judgment, the trial court did not set forth the elements of proof suffering the absence of factual support. Instead, it placed the emphasis in what it called "a very interesting case" on the difficulty any plaintiff has in satisfying the burden established by La.R.S. 9:2800.6 by stating that "[w]hen I was practicing, I handled many of these cases. I stopped handling them after the amendment in '96 because they appeared to be unwinnable and very in favor of the store and very much against the patrons who may or may not have slipped and fell." Without further explanation, the trial court granted the motion, stating only that "I believe that the motion for summary judgment is well-founded."

It is undisputed that Ms. Alexander slipped and fell in Rees Street Market on the late afternoon of September 22, 2009, and that she sustained a significant injury in the incident. It is also undisputed that it was raining at the time of the accident,

although the evidence is not consistent in setting forth when the rain began or its severity before and during the time of the accident.

Given the rainy conditions, it is generally conceded by the defendants that the mats coming into the store would contain some moisture. However, they dispute the assertion that the floor surrounding the mats was wet, and presented specific testimony asserting that the floor itself was dry. However, factual disputes exist concerning whether Ms. Alexander slipped on the mats or the floor, the physical location of the mats themselves, how Ms. Alexander's clothes became soaked with water, and the presence and/or location of warning signs at the time of the accident.

We also note that Rees Street Market had a cleanup or safety procedure that was reactive instead of proactive. This court in *Barton v. Wal-Mart Stores, Inc.*, 97-801, p. 4 (La. App. 3 Cir. 12/10/97), 704 So.2d 361, 364 (alteration in original), established the following criteria to judge the reasonableness of a safety procedure:

> In evaluating the reasonableness of the protective measures employed by a merchant, this court has considered the following factors to be viewed in light of the circumstances present in each case: "the risk involved, the merchant's type and volume of merchandise, the type of display, the floor space used for customer service, the volume of business, the time of day, [and] the section of the premises[.]" *Thompson v. Stalnaker's Restaurant*, 93-1447, pp. 4-5 (La.App. 3 Cir. 6/1/94), 640 So.2d 733, 736, *writ denied*, 94-1799 (La.10/14/94), 643 So.2d 165.

Additionally, the court in *Barton* noted that the supreme court's decision in *White v. Wal-Mart Stores, Inc.*, 97-393 (La. 9/9/97), 699 So.2d 1081, 1084, made it clear that in considering the application of La.R.S. 9:2800.6, "'[t]he statute does not allow for the inference of constructive notice absent some showing of [this] temporal element. The claimant must make a positive showing of the existence of the condition prior to the fall.'" *Barton*, 704 So.2d at 364 (quoting *White*, 699

11

So.2d at 1084). Additionally, "[w]hether this period of time is sufficient to result in a finding that the merchant had constructive notice of the hazardous condition is a question of fact." *Barton*, 704 So.2d at 364. In the matter before us, Ms. Alexander made a positive showing of the condition of the mats when she fell.

The defendants counter that because *Barton* was decided before the 1996 amendments to La.R.S. 9:2800.6 concerning constructive notice were enacted, the level of constructive notice required is now higher. The pre-1996 version of La.R.S 9:2800.6 (C)(1) reads as follows:

> "Constructive notice" means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.

The post-1996 version of La.R.S. 9:2800.6 (C)(1) reads as follows:

> "Constructive notice" means that the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

In the context of a motion for summary judgment and the question of whether genuine issues of material fact are present, we do not find that the change in the definition of constructive notice is dispositive of the matter before us. Additionally, Ms. Alexander cites this court to the decision in *Bassett v. Toys "R" Us Delaware, Inc.*, 36,434 (La.App. 2 Cir. 12/30/02), 836 So.2d 465, *writ denied,* 03-0560 (La. 4/25/03), 842 So.2d 408, which was decided under the current version of La.R.S. 9:2800.6. In *Bassett*, the second circuit explained that if the temporal element, which imposes the burden of proving that a sufficient amount of time had passed for a merchant to become aware of the condition, must be established by direct evidence, "it would impose an impossible burden. It is

12

unlikely that a legitimate shopper would immediately after a fall seek out other shoppers or store employees to inquire how the condition causing the fall came about or the length of time it existed." *Id.* at 469. The court went on to conclude that "the factfinder can reasonably infer from circumstantial evidence that it is more probable than not that the condition existed for such time prior to the accident that it should have been discovered and corrected." *Id.* In *Bassett*, the court concluded that the temporal element had been satisfied by the fact that it had been raining most of the day, and a trier of fact could conclude that the hazardous condition should have been discovered by the store employees.

In conclusion, the facts and law establish that there are genuine issues of material fact and that Rees Street Market and State Farm are not entitled to summary judgment.

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the trial court's grant of the summary judgment in favor of the defendants, Frank's Five Star Market, Inc., d/b/a Rees Street Market, and State Farm Insurance Company, and against the plaintiff, Feverly Alexander, dismissing her suit against the defendants. We remand the matter to the trial court for further proceedings consistent with this opinion. We assess all costs of this appeal to the defendants, Frank's Five Star Market, Inc., d/b/a Rees Street Market, and State Farm Insurance Company.

**REVERSED AND REMANDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

NUMBER 12-976

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

FEVERLY ALEXANDER

VERSUS

FRANK'S FIVE STAR MARKETING, INC. D/B/A REES STREET MARKET, ET AL.

AMY, J., dissenting.

I respectfully dissent from the majority opinion as I find that an affirmation is required in this case.

The evidence indicates that the defendant had taken precautions, such as the placement of mats and signage, due to the foul weather. Also, the plaintiff traversed the area numerous times before the incident. Given these circumstances, I do not see that the plaintiff's submission in opposition to the motion for summary judgment indicates that she "will be able to satisfy [her] evidentiary burden of proof at trial[.]" La.Code Civ.P. art. 966(C)(2). In short, I see no evidence from the plaintiff demonstrating that a wet entrance on a rainy day, with certain warning measures in place, posed an unreasonable risk of harm as described in La.R.S. 9:2800.6(B)(1), let alone one that existed for the period of time as required by La.R.S. 9:2800.6(C)(1). *See also Turner v. Brookshire Grocery Co.*, 34,562, p. 4 (La.App. 2 Cir. 4/4/01), 785 So.2d 161, 164 (wherein the second circuit explained that "[t]o require a merchant to keep the entrance/exit areas completely dry during rainy weather, or to hold the merchant responsible for every slick place due to tracked in rain water would, in effect, make him an insurer of his customer's safety." The second circuit determined that such status is not required by La.R.S. 9:2800.6.)

For these reasons, I would affirm the trial court's judgment.